Mr. Lombardi, please proceed. Thank you, Your Honor. May it please the Court, this is an obviousness case where all aspects of the claimed invention were taught in the art. Both major components of the invention, the active ingredient testosterone and the penetration enhancer, were known and taught in the art. The need to combine testosterone with a penetration enhancer was known in the art, and the combination of all of these elements together was taught in the art. Can I just double-check something, or correct me if I'm wrong? You don't make any argument that even if some of the claims are invalid for obviousness, others are not. That is, it's a single ball of wax for you on obviousness. It is. Counsel, my opponent in the case, calls out two particular claims to focus on other than the whole, and we do argue that those two claims, and for the same reasons... But for example, you don't say, well, even if claim one is invalid for obviousness, nevertheless, some other ones survive, I'm assuming because you don't get anything out of that with your ANDA. Correct. Yes. I misunderstood your question, Your Honor. Yes, we say that everything is obvious for essentially the same reasons. As I said, there's some claims that our opponents treat differently and talk about differently, and we respond to that, but we think everything is obvious. One other kind of, for me at least, housekeeping matter. Why does your infringement contention matter? It's a fair point, Your Honor, because in terms of our ANDA, as a practical matter, we have to win on obviousness. That is true. We did think, and we did have this discussion, as you can imagine. We did think that the infringement situation where, in our view, the district court flipped the burden of proof and put it on us... Sort of an indication of general wrongheadedness? Well, no, it was an indication of something wrong that we thought it would be good to have court precedent on, that we thought it would be good to have this court speak on. I understand that's something that, Your Honors, in your discretion will decide whether to do or not, but we felt like it was an important enough issue, and that the district court had gotten it wrong, that we should be addressing it. The district court finding of obviousness here was made in spite of all those findings. All the findings the district court actually made that the elements are all in the art, and the district court specifically said, and I'm quoting at paragraph 136, said another way, the court finds that while the pieces of the patent in suit were known, their combinations, and especially their specific ratios of the combination, were not obvious. The district court saw what it thought was a gap in the prior art, in terms of the ratios of the combinations, and based on that gap, concluded that this was not an obvious invention. What is the best prior art that indicates taking the... Since we just agreed, I think, that you're doing obviousness as to all the claims as a single ball of wax, that shows the full claimed penetration enhancer with the ranges of whatever the narrowest one is, with testosterone, I guess, would be the best. Because part of, at least, the problem I've had here is that there's so much prior art, I don't quite know where to look for the single cleanest case. Well, your honor, there are a few, and it's because this testosterone gel and penetration enhancers were thoroughly taught in the art, but in terms of prior art that actually has testosterone with the penetration enhancer, you could look at the... With the specific claim penetration enhancer. Yes, the three components. It would be Patel, the 190 Patel reference, there are two Patel reference, but Patel 190. It would be Cooper, which was identified as the closest prior art in the patent office. You would also have... Those are the ones with testosterone specifically taught, but there are also pieces of prior art that have had the exact penetration enhancer, that is taught as something that can be used with transdermal gels, like this one. That would include Frank Kerr, which actually had the exact penetration enhancer, including the amounts in it. That would be Santus, which had... Sorry, including... When you say the amounts, you're making an assertion, again, about all of the claims now at issue? Well, your honor, there are claims. When I say the amounts, I guess, to be... The narrowest claim. I'm sorry. You mean by the amounts, you mean the narrowest claim? The narrowest. Let's be clear. Claim 19 and 20 have no amounts of any kind for any of the penetration enhancers. It only, and this is of the 913 patent, it only has an amount for testosterone, between 0.1 and 2%. You can have any amount at any percentage of any of the others. Those claims, it seemed to me, would be the easiest for you to render obvious, but since you haven't separately argued them, because, again, your ability to practice turns on killing all of them and not just some of them, you have to focus on, it seems to me, and unless your opposing counsel tells me I'm wrong, claim six of the 913 patent, right? Is it 913? No. 1865. 1865 patent, because that one narrows the oleic acid between 0.1% and 5%, but it doesn't otherwise limit any other aspect of the penetration enhancers, so the only limits provided by claim six, unless I'm mistaken, are, since it depends on claim one, the amount of testosterone, which would be limited to 0.1% to 2%, and then the amount of oleic acid, which would be 0.1% to 5%. Now there is a claim 22, now, again, that doesn't also, that limits the, as far as I can tell, the glycol to 30% to 40% by weight. That is not dependent on six, so you have claim six, which limits only oleic acid and none of the other penetration enhancers, and you have claim 22, which limits only the amount of glycol and none of the other penetration enhancers. All those penetration enhancers are utilized in the composition, but there are no specific ranges given for any of them. Is my understanding of the claims correct? Yes, I think your understanding is correct, Your Honor, and so focusing on that, the amounts of oleic acid are clearly taught in Cooper, and in Cooper 934, and I'm referring to various examples, Your Honor, 11, 14, and 15, and also example 26. Now, because there was so much prior art, I have to admit to not having a perfect mastery of all of it, although I think I have Patel down really well, but my Patel was 970, so I was really surprised when you thought 190 was better, but nonetheless, 11, 14, and 15, you said it has the concentrations of oleic acid. Does it also have, and it doesn't matter what amount because the claims don't require what amount, but does it also include glycol, and does it also include an alcohol? I'm sorry, I missed which reference you were talking about, Your Honor. Cooper. You said Cooper 934 examples 11, 14, and 15 have the amount of oleic acid in the claimed range, 0.1 to 5%. My question to you is, do those examples employ the other two aspects of the penetration enhancers as well? It employs the aspects, but not the specific amount. So for instance, Cooper. There is no specific amount specified by the claim. Well, in claim 22, if you're talking about claim 6, Your Honor, you're correct. Claim 6. Let's start with claim 6. Yes. You're telling me Cooper has between 0.1% and 5% of oleic acid. It also employs alcohol and glycol. It doesn't matter what percentage because for claim 6, that's irrelevant. That's correct, Your Honor. And the problem with Cooper though, according to the district court, was it just lists male sex hormone in a long list of 50 different potential ailments slash active ingredients. And the district court's problem, as I understand it, was the predictability of choosing this particular composition of penetration enhancers and plugging it back into a given active ingredient. Is that right? That's correct. And specifically, the district court found that disclosing male sex hormone does not disclose testosterone. That's really curious to me because I'm a woman, so maybe I'm a little daft when it comes to this. How many male sex hormones do people have? I can't tell you the amount, but I can tell you that as a matter of record in this case, testosterone is the most important and the primary male sex hormone. And I found that curious as well, Your Honor, because the entire argument, or most of the argument related to- It's almost irrelevant, though, because even if I agreed with you that it's clearly erroneous for him to find that, which I don't know that I can on this record because I don't see evidence that proves that male sex hormone is dispositively testosterone. But putting that aside, he gave a second reason, which is you can't just cherry pick one from this column and these from these columns and put them together. There's unpredictability in this art. We don't know it'll work. So what is your response? My answer to that, Your Honor, is that there is art that teaches testosterone with the components of the penetration enhancer. When we get into the amounts of the penetration enhancer, our position is that as a matter of law, the court erred there because the patent teaches that a person of skill in the art could determine the appropriate amounts. The district court completely ignored that part of the patent. Our opponents never addressed it, and they haven't even addressed it in this appeal. So the patent says, at column, I'm talking about the 913 patent right now, column 3, line 63, the appropriate amounts or concentrations of the active agent, in this case testosterone, will be readily apparent to the skilled physician or the formulator preparing the formulation. As to the parts of the... Well, I mean, I don't know that I've heard any dispute by anybody or even the district court about the range of the testosterone to be utilized. And Your Honor... Am I mistaken on that? No, I don't think there is any dispute. So why don't you focus on where the dispute is? Then I'll take you to the same patent, the 913 patent, column 5, lines 31 to 34, which says the amount of the penetration enhancers will be readily apparent to those skilled in the art, since the total amount of penetration enhancers will be approximately the same as those of the prior art. That's in the patent. And when a patentee makes assertions about the state of the art in a patent, they are binding on the patentee, and we cite PharmaSTEM in other cases for that proposition. As I say, the district court never considered that. And so while the amounts... Is your view that there's a single reference that teaches the penetration enhancers, putting aside amounts, because I think you're arguing that that's really irrelevant, with testosterone? Yes. Patel. Now, if that's the case, why did you argue seven different references for obviousness? Why weren't you just arguing Patel? Well, Your Honor, because our attempt was to show that this is a very full art, and that this is not just taught just once. In obviousness cases, we frequently run into the idea that there's not that much in the art. This is an art where there is enormous... That makes it seem less obvious to me if I have to look at seven different references instead of one or two. And I understand that, Your Honor. But I would say Patel 190 teaches all the elements, that Cooper teaches the elements, and understanding Judge Moore's statement about the testosterone, that was an issue in the court. Frank Kerr teaches the precise penetration enhancer. It teaches... It's a patent that goes to penetration enhancer. It teaches the precise penetration enhancers in the precise amounts, in example 15. The only combination necessary... But it's a different active ingredient. It was no active ingredient. In fact, in that example, there was a different active ingredient, but the gist of the patent was the penetration enhancer. And yes, there wasn't a teaching of testosterone specifically, but testosterone was taught to be a transdermal formulation that needed penetration enhancers. This penetration enhancer was called the most preferred in various pieces of art, more than one piece of art, in Santus and in Frank Kerr. And so this... Why are you hung up on Patel 190 and not focusing on Patel 970? I'm confused about why you're so wedded to 190, because you've got a clear error effect problem to overcome, which is what does GLY equal? And your expert said one thing, and what he said is apparently scientifically inaccurate, and the district court came out the other way on you on what it is. And that seems like something I'd have a hard time saying. It's clearly erroneous. So why... I mean, 970 doesn't have that problem. So why are you so focused on 190? What do you think is so great about this? We can look... No, no. We can look at the 192, but may I just address the... I'm sorry. You're right. The 970. But may I address the 190? The only evidence... It seems like it's a good use of your time, since your time is up, but if you really need to, go ahead. Well, the 970 gets you there, too, Your Honor. And the only thing to keep in mind with the 970 is the exact amounts aren't taught in the 970, but there is a teaching of a penetration enhancer that has probably... Wait. What do you mean the exact amounts aren't taught? Column 12 of the 970 says 5% oleic acid and 95% glycol. That's the example in column 12. I mean, that seems to teach the amounts that fall right within the claim. That's not the same amount of propylene glycol as exists in the claim. For instance, claim 22. That's in both of them. But that's a different claim. I'm talking about claim 6. The only claim that has an amount listed for oleic acid is claim 6. Claim 22 does not import that limitation in, correct? Correct. And for claim 6, why doesn't it die in light of the example in column 12? It does, Your Honor. And I'm sorry, I misunderstood the gist of your question. Which example, precisely? The example in the 970 is at column 11, excuse me, example Roman 2. Right, and it's at various test numbers. Which test number are you referring to? It's 2-D is the one that talks about PG is propylene glycol and OA is oleic. Well, even better than that one, what about the one in example 3, which also has oleic acid and the glycol, also at 5% and it is expressly utilizing testosterone, as it says in the paragraph at the bottom? I don't know. The one in example 2, it doesn't seem clear to me what the active ingredient is, but... 2-D doesn't have ethanol in it, does it? 2-D does not recite ethanol. Okay, so it's not the same. Well, it's the same amounts of oleic acid, which is what I understood Judge Moore to be asking about. Right, but this is not the trifecta combination. No. Okay, is the trifecta combination in one of these examples? The trifecta combination is not in Patel 970, but it is in Patel 190. Why would you say that? Did you not read the claims? Claim 39 is the trifecta. I'm sorry, Your Honor. I understood Judge Toronto to be asking me a different question, which is for the three elements. All three is what I understood Judge Toronto to be. It's in the claims of Patel. You didn't point, unfortunately, as far as I can tell, to claim 39 in your brief, which might suggest it is dependent on claim 1 to actually have the trifecta. Your Honor, I don't know if I have any time to reserve, but I will sit down and take a look at that and be prepared to respond. Thank you, Your Honor. All right. Mr. Golub, am I saying your name right? Golub. Golub, thank you. Mr. Golub, please proceed. Well, Your Honor, if we turn to their obviousness case, this is the first time in three years we're hearing about any particular combination or any particular reference. All we've heard from them is that there is this bundle of prior art, and it's actually 10 references that they list, and they put testosterone in a specific combination with the penetration enhancers. But what they're saying is everything individually was known. They pointed to no prior art that had either testosterone with any kind of penetration enhancers. At the same time, this is a two-tiered analysis. The patent makes clear that when you're dealing with transdermal formulations for penetration enhancement, you have to consider irritation. The patent says it all through there. But the claims don't say it. And the claims, in fact, if you were to look at claim one of either patent, it has absolutely no limits at all on the concentrations of any of the penetration enhancing ingredients, does it? It does not. So how would that control for skin irritation? You don't have a limitation like a wear-in clause wherein the amounts are limited to So how can you justify the non-obviousness of claim one? Well, the Supreme Court said in Adams that you are permitted to consider the objectives of the claimed invention from the specification to assess the prior art. This court did the same thing in DuPont in 1988 and held that Adams is proper when you are considering rebuttal to an obviousness assertion. So the court is permitted, which is what the district court did, is take into account that all through the patent, it relates to penetration and skin irritation. And when you look at Patel, the Patel that he's talking about, the 970, you see that when you just put two of them together... But claim one, yes, they might be talking about reducing skin irritation, but claim one which has absolutely no limits of any kind on any percentages of any of the ingredients but for the testosterone. How in the world does that claim... Do you think the specification contains a disclaimer that indicates that only amounts that will result in a reduction in skin irritation, for example, ought to be read into this claim? Is there a disclaimer somewhere in there? No, there's not a disclaimer in there. There's no disclaimer. There's nothing in the claim that requires a reduction in skin irritation. It's not even mentioned. And the claim contains no percentages of any kind. That's correct, Your Honor. But as I said... How is that claim not rendered obvious? Because there's nowhere when you're looking at penetration for a transdermal product, you must consider irritation. And all of the art that they are showing you tells you when you're putting these types of penetration enhancers together that our inventors chose, they would cause severe irritation. No, actually that's not correct at all. In fact, when you look at... I believe it's called Fokir. I may be getting the name right. Francor? Francor, yes. It teaches all three penetration enhancers and expressly says you should, and I'll quote, reduce the oleic acid concentration to 0.1 to 1% weight by volume for reasons of efficiency and lack of irritation. So we have one reference that doesn't disclose testosterone, mind you, but it expressly teaches a reduction in oleic acid in order to eliminate skin irritation. And it's not, in fact, the only reference that teaches that. There are other references that teach the same thing. So I'm confused. How in the world do you conclude 0.1 is not obvious? We don't disagree with the fact that lowering your concentration of oleic acid will benefit in some level of skin irritation. But this is a balancing situation. That's not the only... Not your claim. Your claim is no balancing. Your claim has no limits to any ingredients at all. So how is it balancing anything? But the claim has three different... Unbounded. Completely unbounded. The claim has three different components to that. It has a mixed alcohol. And all three of those are disclosed in Francor's 548 patent to be utilized together as a penetration enhancer. All three of them. None of them are missing. Well, but Francor is not testosterone at all. And Francor, the court specifically made factual findings that you couldn't just take a penetration enhancer from here and flip a new active in there. The prior art taught you you could not do that. What's the most specific piece of prior art that says the same penetration enhancer might produce quite different results depending on the active ingredient? 2E2 tells you what happened in 2E2 is they took the three components and they tested it with two different actives. And they got markedly different results. Markedly different results as far as the ability to penetrate. And so 2E2 said, and I will try to quote it for you, they tested two different actives and in that transdermal formula, the 2E2 people said that because there were such divergent results when you change the active, that when you're considering transdermal formulations, you must consider a three-part situation. What active are you using? What penetration enhancers are you using? And what part of the skin you are going to be using? 2E2 is clear on that. That you can't do that. In addition to that, the Cooper reference, the 934 that you have talked about as well, that reference told you don't, first of all, that was a two combination, not a three. And it said don't use oleic acid. It said use azone. It also said once you're moving to systemic transdermal formulations, they are complicated and unpredictable. And with Cooper... And the district court clearly agreed with you and made a fact finding to that extent. However, Patel clearly discloses using testosterone and in one example using two of the three penetration enhancers, in another example using the one that wasn't used before, alcohol, and again the oleic acid. And then in the claims, claim 39, it actually discloses using all three together in combination against the active ingredient. And it discloses all of this in exasperated detail with testosterone in the relevant percentages. And it says it works as a penetration enhancer effectively with testosterone. So, I don't understand. What am I missing? Well, Patel... How is there unpredictability about whether these three ingredients will work as a penetration enhancer with testosterone? Because again, as the PTO found and as the court found, this is a two-part determination. When you're looking at penetration enhancers, you must consider skin irritation. And what Patel 970 tells you is, first of all, they had either propylene glycol and ethanol or propylene glycol and oleic acid. And they say when you combine propylene glycol and oleic acid in the percentages that are here, 5%, you get severe irritation. So nobody would be looking to that because you're trying to solve a problem of... Do you disagree with the apparent reading of Claim 39 that they actually claimed the three-part combination? Well, this is the first I've heard about it because they didn't argue it below, but... The reference was given to the court as part of the prior art he was considering. Absolutely. My first look here today would say that these are not used as penetration enhancers. It says they're inner dilutants. That's... But Claim 1, I think, defines that as part of the penetration enhancer, if I remember right. Yes, it does. B3? Well, the other thing is there's about 8 or 9 or 10 of them here, and what would lead somebody to say, well, only use these three and just these three. So this Claim 39 is no different than Patel 190, which although it had testosterone, it has five different penetration enhancers in there. What's the motivation to go to just these three when especially the earlier Patel tells you when you go to these two, you're going to get severe irritation in the amounts that the patent describes? I may be missing something really obvious, I guess, to use the word. But if Patel 190 is understood to describe, among many other things, the combination of testosterone and this penetration enhancer within the ranges covered by the 835 and 913, what's missing from an obviousness case? Well, Patel 190 doesn't disclose these three by themselves. It discloses five of them. And it discloses Patel 190... You say five of them? Five different penetration enhancers of which the three in this... Right, but is one of the things that Patel 190 discloses the three-part combination that make up a claimed penetration enhancer in the claims that issue before us? No. It doesn't disclose three and only three. It discloses five together. It doesn't disclose... Never the three alone? Never the three alone. Ah, okay. It discloses five and there's no reason you would go to the three. Additionally, as you probably understand, the Patel 190 is Theratech. That is the androderm patch. That is the prior art that our inventors were trying to get around. So they knew, and everybody knows, and the defendants will not dispute, that that patch caused severe irritation. Unbelievable. There are pictures with welts from trial and all of this. So that is why would somebody be looking there when it doesn't have the three, it has the five, and that's the very art that's causing the severe irritation that you're trying to get away from. But first off, to be clear, Patel doesn't say anything about severe irritation. Patel says, does not possess the skin irritation properties. That's all it says. I don't see the words. If I can look at A621. That's where I am. Yes, it says it does not possess... Last paragraph on the bottom. However, this combination of oleic acid and propylene glycol causes severe skin irritation. Where are you? Line 63. On column 11. This combination of oleic acid and propylene glycol causes severe skin irritation. Not only did the court think this taught away, but the patent office thought it taught away too. All this art that we're talking about is in front of the court. So this combination causes severe skin irritation. But then you have Augunst, Francoeur, and other references which disclose the trifecta to be used for penetration enhancement purposes expressly indicate that you can eliminate or reduce the skin irritation problem by simply reducing the amount of oleic acid to be utilized. Why doesn't that solve the problem? So Patel discloses everything. In fact, claim 39 claims all three in use with testosterone. And Patel gives two examples. And the only drawback it tells you is skin irritation. Then you have at least two references which clearly on their face expressly address the skin irritation problem. Both references are the trifecta of ingredients for a penetration enhancer. And both references say you can reduce the skin irritation by reducing the concentration of the oleic acid. Why doesn't that get you there? Why isn't that the whole ball of wax? Well, first, claim 39 has a lot more than three as I discussed earlier. Let me talk about Augunst. Augunst references when they tested propylene glycol and oleic acid against all of the other penetration enhancers. They found that that combination was the worst at penetration enhancing and the second worst at irritation. It was triple the next one. So Augunst is not telling you to use oleic acid and propylene glycol. It's telling you to use anything else. Hold on. It says it has no, minor or no, and these are quotes from it, irritation at concentrations below 5%. And I didn't remember that example which is at A1339 suggesting it didn't function as a penetration enhancer. If I could just have a second. It's on 13. 1339. That's the part I'm reading from. There's two tables in there. I don't have the exact page in front of me. But there's two tables. And the tables show you the penetration enhancing. I believe it is at 1354. I'm reading from 1339. Why don't you turn to that because there are two different Augunst references. Correct. One of them is not so good for them, but one of them is good for them. Well, the one that you're reading from says, the major task in successfully using fatty acids for delivering drugs through the skin will be in avoiding skin irritation. That's at 1340 for that one. So... So if we're looking at 1339, it tells you about 10% here. It does tell you that the lower you go, the better it will be. But the problem is, is that once you go lower with oleic acid, you have to balance, especially according to 2E2 and the other references. This is a three-part analysis. You have to look at where you're putting it on the skin. You have to look at the... The claims don't limit where it's being placed on the skin. No, the claims do not. So then why do I need to look at where it's being put on the skin to decide whether these claims are anticipated or rendered obvious? Again, because this is a transdermal formulation according to the specification. It takes all of these things into account when you're deciding how you're going to come up with your possible penetration enhancers. Can I ask you just a couple of very focused things? So we were looking at 1340. I think you actually read something from that. There's a sentence almost exactly in the middle in the paragraph just before summary. It was claimed that an oleic acid... PG, is that... Propylene glycol. Propylene glycol, glycerin. I see, that's missing the alcohol. I see. Right. Okay. And can I turn back to hotel 970, 621? You noted the sentence, this combination of oleic acid and propylene glycol causes severe skin irritation. Yes. That's a sentence that, again, is about test 2D, which doesn't include the alcohol. It doesn't include the alcohol and it also would apply equally to example 3 because it's the same percentages of oleic acid as well. Well, how do we know that? Example 3A is the one that has the three-part penetration enhancer, right? Oleic acid. Does that have the... I think it was example C. Is glycerol dilate the same? Is that covered by the glycol in the claims as defined by the spec or not? No. Okay. So which is the example in example 3 that has the three-part combination? In 3, you see the 95 propylene glycol. I think it's C and the 5% oleic acid. But no alcohol. But no alcohol. Well, there's ethanol, but no mixture. No mixture. Okay. So the mixture isn't disclosed. The alcohol is disclosed in the following example, right? Example 4, where you have oleic acid and the alcohol. Is that right? In example 4F, alcohol plus oleic acid and testosterone expressed in example 4. Right. But I don't have that piece. Does that one have propylene glycol in it as well? No, it doesn't. Right. So it's missing some of the components. Right. So propylene glycol and oleic acid are in example 3. Right. And oleic acid and alcohol are in example 4. Right. And the claim covers all three. Correct. And your question is, we've got to focus, you claim we have to focus on skin irritation, even though most of the claims have no boundaries whatsoever for any of the ingredients. And we know that at various concentrations, these will cause skin irritation. And your claims are unbounded. But what you never dealt with, what I'd like you to focus on, is page 1339, and the sentence in particular that I read to you before, which says oleic acid at 0.5 and 1% concentration, causes no change or only minor damage to guinea pig skin, but these concentrations are still effective at enhancing transdermal absorption. So you claimed to me before that one of the flaws was they may say reducing oleic acid, but they don't talk about it still being effective as a penetration enhancer. But this actually expressly says it reduces it and is still effective as a penetration enhancer. So go ahead, consult for a second. Okay. Yes. So that discussion is with guinea pigs versus humans, and that's a distinction that's made here in terms of... I didn't see the district court make any fact findings anywhere that suggested that the results shown on guinea pigs would not predictably translate into humans. Did he make any finding along those lines? No, but he made a general finding that this art in general is totally unpredictable, and changing the slightest thing will make it... you don't know what's going to happen. No, he made that finding with respect to picking active ingredients and penetration enhancers and making those combinations. I never saw any suggestion or discussion anywhere in the idea that because this was shown to work on guinea pigs, there's some question about its predictable use in humans. No, he did not make that. He made a more general one that it was unpredictable in terms of just putting the penetration enhancers together and then putting them with a certain active. He made it general. If I could address the angst that you were talking about for just one minute and I know I'm over. If we look at A1356, you'll see the chart down at the bottom and you'll see oleic acids enhancement factor. This is the second angst? Yeah, this is the second angst. That's not the same reference that I was just reading from. I don't have any disagreement with you or the district court's finding about one of the two angst references. It's the first one that is problematic, which is why I was reading from that. You were looking at this A1357. Is there text or is this the... This is the chart. On A1356... The table or the... The table, I'm sorry. Not the diagram because the diagram has a counterpart. Right. At the bottom, in the middle of the table, it shows you that oleic acids enhancement factor is 14, which is the worst of all of them. Interestingly, to show you how a small difference can make a huge difference...  I've lost my place now. What page am I on? A1356. There's a chart. A1356. Down here at the bottom? Right here? Yeah. So if you look, you see the enhancement factor for oleic acid is 14. And yet you see the one below, oleic acid, which is an isomer of oleic acid, has almost double the enhancement factor. And then when you go to the next page, A1357, you see that oleic acid, the skin irritation index is 2.3, which is triple the isomer that's G below at 0.7. So you can see making a small change to an isomer of an oleic acid has a profound effect on what's happening. So there is no way to predict that this penetration enhancer, when you put these three together, they're going to work no matter what the percentages are. Whether you lower one, you might have to up another one, and it's just totally unpredictable. But your patent doesn't claim any of those percentages. That's the part that's still driving me crazy. Well, I didn't write it, but I apologize. But it does claim, in Claim 6 and in Claim 22, there are specific ranges. Which are not dependent on each other. So Claim 6 gives you a range for oleic acid only and allows any range for glycol and for, what's the third one? Ethanol. Ethanol. A mixed alcohol. Right? So any percentages. Correct. And then Claim 22 has a percentage range for glycol, 30 to 40, I think, if I remember right. Right. And no limits on the amount of oleic acid or on the amount of alcohol. Right. But Frank Kaur, the reference you were talking about, says when you use more than 10% of propylene glycol, you get severe irritation. So again, all of these references... And so that would help you on Claim 22. Correct. But it would be of no value to you on any other claim in the patent because no other claim on the patent has a limit on the amount of glycol. Well, I think... Correct? No other claim that we're asserting has a limit. In either patent. Right. That are being asserted. Fair characterization. That we're asserting. Okay. That's correct. All right. But again, the problem is this is a two-part test. Most of this art that you're talking about was before the Patent Office. The Patent Office made a determination that both Patels teach away. The District Court made that same finding. It wasn't clear error. The Patel 970 that you talked again, it was only two. That Claim 39 listed about eight of them or nine of them. There's no reason to take three. Eight of nine that could be used for glycol. Oleic acid was fixed in Claim 1 and the alcohol was fixed in Claim 1 and then Claim 39 added a third penetration enhancing ingredient to be selected from a list of eight or so. Right. So why would you pick one versus the other when there's so much art out there that tells you that oleic acid with propylene glycol is going to cause severe irritation? So why would you pick a mixed alcohol from Claim 39? There's no teaching or anything that would teach you to find a mixed alcohol and when you're looking at the oleic acid that they're talking about, again, it's causing severe irritation at the examples that they're giving. One more thing. You say there's nothing to teach you that but Francor actually does. Francor teaches you to use the three as does the Ongst reference that I read from and both of those two references, both of them, do teach those three exact combinations as penetration enhancers and both of them expressly address the skin irritability problem being solved by reducing oleic acid. And so those don't pertain to testosterone. Grant you that but don't both of them do that? Both of them tell you and it's well known in the art that if you reduce the oleic acid you would get less skin irritation. And in this exact trifecta combination, correct? No. The book here does not disclose the trifecta combination for penetration enhancers? It does but it says once you use propylene glycol above 10% which you would have to do if you use 0.1% oleic acid, now you've got Francor telling you that that's irritating and don't do that. And Francor again was before the patent office and was also before the court and the district court made these findings that that taught away because of the excess glycol. And again, Francor is not testosterone. The only one that's testosterone is Patel and it teaches you severe irritation or it teaches you this is the patch that we want to get over and here are five different possible ones you could use and why would you pick these particular three. All the other art was before the patent office. Can I just ask one question which I think is just I'm looking at 190. It was you said earlier that this is page 612 and 13 of the appendix the Patel 190 patent and you said that the 190 never teaches the three oleic acid ethanol and propylene glycol and a mixture alone and that's because every example has the methyl chloride part of it? Yes. Okay. Okay. Thank you very much. Thank you very much, Your Honor. Mr. Lombardi I'll give you two minutes two or three two minutes of rebuttal time for questions that may end up going a little long. Thank you. You found a reference to claim 39? I did, Your Honor and I agree with Your Honor's reading of claim 39. No, no, no. I'm sorry. A reference in your briefing or submission to the district court about it? No, Your Honor. Okay. Your Honor to go back to Francour and the statement that it teaches away in terms of the amount of propylene glycol I don't believe that's accurate. If you look at column 19 of Francour which is at appendix 1266 it has the oleic acid is referenced in the paragraph above the table and then the remainder of the penetration enhancer is below and you can see there are several examples where propylene glycol is used in the percentages that are claimed in claim 21. Walk me through that a little slower. I'm sorry, Your Honor. So we're at example 15 of Francour and at line 38 it talks about 0.25% of oleic acid that's within the claims and then if you look at the table it talks about ethanol that's the alcohol and PG which is the propylene glycol and so with the slashes there the ethanol is first and the propylene glycol is second and so specifically if you look for instance at the second 33 slash 33 indicates that that has 33% of the propylene glycol the one below it That would fall right within claim 22. That's correct. So would the next  one, and the next one. That's correct, Your Honor. There are four examples that would fall right within it. That's correct, Your Honor. And the reference to propylene glycol is allegedly being These things have a third slash. What's the third slash? The third slash is the Trist buffer solution. Does that matter? No. No, Your Honor. I knew you were going to say that. This is my problem. How do I know that doesn't matter? This case we talked about minute references to show why or why not this is obvious. The District Court made a lot of factual findings and we're disputing whether they're right or not. And you just said something that I haven't heard about doesn't matter. How can I reverse the District Court based upon something that wasn't ever told to me before? Well, this wasn't I can say this, Your Honor. What I'm saying is that this was presented to the District Court if it did matter we could anticipate that it would have been raised by the other side and it was not raised. Well, in one of the examples in the third example it's zero, right? Like in the third example that you just pointed me to it's actually zero in the third column. And that's correct as well, Your Honor. I will just comment that Your Honor is exactly right on the skin irritation point not being claimed which I think is a key factor in this entire case. The District Court I think based a lot of its ruling on the fact that it felt that any reference to irritation in a reference in a prior art reference taught away. But the fact is that there's no claim to reduce skin irritation. There's no quantification of reduced skin irritation and it was known in the art that skin irritation was caused by penetration enhancers and that you reduced that skin irritation by reducing the amount of the penetration enhancers. So the skin irritation I think was an example the emphasis on the skin irritation and how to deal with skin irritation. I know that Judge Hughes kind of said this a second ago and I guess I want to echo it because I think that you have some good points buried within a morass of issues that you appealed. I think that it's possible the District Court clearly aired a number of different fact findings but some of those are almost irrelevant to whether you can prevail or not. And the difficulty is you didn't narrow down or focus your issues on appeal for us to allow you to thoroughly and thoughtfully address particular references or particular combinations. You literally threw 12 references at us and I don't see in your brief much of an attempt to say this plus this renders this claim invalid. I said to my law clerks, before you get started on this, make a chart. Claims, elements, references across the top, boxes with little X's where you see them. I don't know the shotgun approach you may have felt like was good before the District Court but it didn't serve you as well before us to be honest with you. This is a complicated case and I think you've made some good arguments but unfortunately they aren't as flushed out as I wish they were given the complexity of the technology. We've got a room full of people. I feel like you're all here for this case. I'm not just speaking to you. I'm speaking to the entire room full of people because you want us to understand and master this kind of stuff. 12 references without identifying particular combinations and linking them up for what they teach to particular claim elements and everything else. You're putting a lot of the burden on us and it doesn't serve as well in terms of your ability to persuade especially when you're a group of people. I'm hoping that there's in-house counsel here as well. Hopefully you can take this back to them the next time if they fight you on how many issues to appeal you can say look at this transcript. I have to conclude the argument and I want to say you both did a fabulous job. I appreciate all the effort and thorough understanding of an enormous amount of material. It was helpful to me. Thank you both. I appreciate your comments. Thank you.